# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LORNA LYNN DUKE,<br><br>       Plaintiff,<br><br>  v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>       Defendant. | Case No. 1:16-cv-00333-SAB<br><br>ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL<br><br>(ECF Nos. 15, 18) |

## I.

## INTRODUCTION

Plaintiff Lorna Lynn Duke ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from depression, lumbar degenerative disc disease, status-post minimally invasive left-sided transforaminal interbody fusion at L5-S1 with segmental pedicle screw fixation and possible pseudo-arthrosis across interspace; and obesity. For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge. (See ECF Nos. 4, 6.)

1

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for a period of disability and disability insurance benefits on February 28, 2012, alleging a disability onset date of January 10, 2011. (AR 76-77.) Plaintiff's application was initially denied on September 5, 2102, and denied upon reconsideration on February 25, 2013. (AR 112-116, 118-122.) Plaintiff requested and received a hearing before Administrative Law Judge Cynthia Floyd ("the ALJ"). Plaintiff appeared for a hearing on June 24, 2014. (AR 36-75.) On July 21, 2014, the ALJ found that Plaintiff was not disabled. (AR 19-32.) The Appeals Council denied Plaintiff's request for review on January 11, 2016. (AR 3-5.)

### A. Hearing Testimony

Plaintiff testified at the June 24, 2014 hearing. (AR 40-64.) Plaintiff was born on July 24, 1964, and would be 50 on her upcoming birthday. (AR 40-41.) Plaintiff lives with her husband and two sons, ages 19 and 17. (AR 41.) Plaintiff has two small dogs. (AR 41.) Plaintiff was 5 foot 3 inches tall and weighed 190 on the date of the hearing. (AR 41.) Plaintiff had gained about 30 pounds in the previous year and a half due to being sedentary. (AR 42.)

Plaintiff completed twelfth grade and does not have any vocational training, certifications, or licenses. (AR 44.) Plaintiff worked as an office technician for the Porterville Developmental Center, State of California, for 29 years. (AR 45.) Plaintiff started as a student assistant while she was attending college. (AR 47.) Plaintiff did not finish the first year of college. (AR 47.) After working as a student assistant three times, she was hired as an office assistant. (AR 47.) She took tests and was promoted to the position of office technician. (AR 47.) From 1999, Plaintiff was an office technician for two different departments. (AR 48.)

Plaintiff did clerical work, such as typing and filing. (AR 45, 48.) Her last position was scanning documents and indexing them. (AR 45.) As an office technician, Plaintiff would lift not more than 5 to 10 pounds. (AR 45.) She stopped working because she could not sit, stand, or walk for any period of time due to pain. (AR 45.) Plaintiff was able to do her job for 5 to 6 hours a day, but got to the point where she was not able to work more than 6 to 10 days a month.

(AR 45.)  In 2010, there were several months where Plaintiff only got paid between 6 and 10 days out of 22 work days.  (AR 61.)  Plaintiff wanted to continue working, but her attendance was so poor that she was forced to retire.  (AR 60.)

Plaintiff's back pain started in 2003 and that year she had her first and only MRI.  (AR 45, 48.)  The MRI showed L4-5 posterior ligamentous hypertrophy.  (AR 48.)  They did not diagnose her condition until 2006 and she had a back surgery – fusion, L4 in 2006.  (AR 45-46.)  After her surgery, Plaintiff returned to work half-time for six months, and then full-time after a year.  (AR 46.)  Plaintiff did pretty well, but after about a year her pain returned.  (AR 46.)  Between 2008 and 2011, Plaintiff worked less and less.  (AR 46.)  Her employer attempted to accommodate her by making adjustments to her work station and allowing her extra breaks.  (AR 46.)  By the end, Plaintiff was lying down in the employee breakroom every break with her legs elevated and a heating pad to make it through a couple hours a day.  (AR 46-47.)

Plaintiff quit working in February of 2011.  (AR 43.)  Plaintiff received worker's compensation benefits for approximately a year prior to her disability retirement.  (AR 42.)  Plaintiff received about $300.00 every two weeks.  (AR 42.)  Plaintiff's disability retirement started on December 23, 2011.  (AR 43.)  Plaintiff receives approximately $1,100.00 per month in retirement benefits.  (AR 43.)

Plaintiff has a driver's license and drives once a week about 15 miles to the store.  (AR 44.)  Plaintiff has been completely sedentary since she retired in 2011.  (AR 48.)  If she does any kind of activity – very limited household chores – she has to do a tiny bit at a time and lay down with her feet elevated.  (AR 48.)  On a typical day, Plaintiff gets up about 8:00.  (AR 49.)  She has a cup of coffee and will make a sandwich for lunch.  (AR 49.)  Plaintiff might do a load of laundry in the morning, but really does nothing.  (AR 49.)  She lies on the couch and watches television with her legs up.  (AR 49.)  Plaintiff likes to read mysteries and romance.  (AR 53.)  She spends time on the computer.  (AR 64.)  She has a lap top that she use on a lap tray so she can lie down.  (AR 64.)  Plaintiff's family helps with everything.  (AR 49.)  If Plaintiff helps make dinner they do the dishes.  (AR 49.)  It is not that Plaintiff is unable to do things, but that she is always in pain and the only way to get relief is to lie down and elevate her legs.  (AR 49.)

Plaintiff spends a lot of time on the heating pad.  (AR 49.)

Plaintiff goes to the grocery store once a week in the evening when her family is there to help her unload the groceries.  (AR 50.)  Plaintiff rarely unloads groceries by herself and if she does then she has to take pain medication and lie down afterwards.  (AR 50.)  Plaintiff takes hydrocodone for pain three or four times per day as needed and celexa for depression.  (AR 50-51.)  But Plaintiff does not take the hydrocodone every day.  (AR 53.)  She does not need it if she is sedentary.  (AR 53.)  She does not like taking the hydrocodone and is afraid of becoming addicted.  (AR 53.)  It makes her feel horrible, lethargic, and she does not like the feeling.  (AR 54.)

Plaintiff is not disabled due to her depression because it is controlled with medication.  (AR 51.)  She has normal ups and downs, but her depression is controlled.  (AR 58-59.)  Plaintiff had physical therapy for her back on and off from 2003 until 2010.  (AR 52.)  She did not receive any benefit from the physical therapy.  (AR 52.)  Plaintiff recently asked her doctor if there was some medication she could take daily to control the pain rather than as needed.  (AR 52.)  She wants to become more active and cannot even take a short walk for exercise without pain.  (AR 52.)  The doctors considered removing the screws and hardware in her back but determined that with her propensity for developing scar tissue it was not a good idea.  (AR 55.)  There would only be a fifty percent chance that additional surgery would alleviate her pain.  (AR 55.)

Plaintiff is supposed to be going to a pain management doctor in Bakersfield.  (AR 52.)  Plaintiff had injections in the past when the pain was radiating down her leg.  (AR 53.)  She had injections a couple of times that did not help, but with the last injection the leg pain went away and never came back.  (AR 53.)  Plaintiff's back pain is aching, burning, sharp, and feels like constant pressure, always tight.  (AR 53.)  When she gets up in the morning her back pain is a dull ache, about four out of ten.  (AR 54.)  If she does a few chores then it will be a seven out of ten immediately.  (AR 54.)  If she goes to the grocery store or Target without assistance then the back pain will be a nine out of ten and she needs to take something.  (AR 54.)  Even if it is not hurting she will lie down so it will not hurt.  (AR 55.)  When Plaintiff lies down her pain is a three or four out of ten.  (AR 56.)  Her level of pain all the time is similar to menstrual cramps.

(AR 56.)

Plaintiff walked two blocks to get to the hearing and her back felt different when she got out of the car than it did after she walked the two blocks. (AR 56.) It took her three to four minutes to walk the distance. (AR 56.) Plaintiff is able to do quite a bit with help. (AR 57.) But everything she does, such as unloading the dishwasher, causes pain. (AR 57.) Plaintiff always waits until the pain level is high before she takes medication. (AR 57.) She will first lie down and use heat because she is terrified of getting addicted. (AR 57.) Plaintiff has to take the pain medication maybe three days per week. (AR 57.)

Plaintiff has to take the medication on a full stomach and even then it sometimes makes her nauseous. (AR 58.) On occasion the medications make her sleep. (AR 58.) She is very affected by medications and when she has surgery she is easily sedated. (AR 58.) Plaintiff is in the least amount of pain when she is lying down with her legs elevated. (AR 58.) Plaintiff spends all day, every day elevating her feet. (AR 58.) She does very little. (AR 58.) The pain is also worse during her menstrual cycle because of the pressure on her back. (AR 59.) That will put her completely down for a couple days. (AR 59.) If Plaintiff goes on a trip with her family and has to drive more than two and a half to three hours she will need to take something for pain. (AR 59.) If she is in a situation where she is unable to lie down and elevate her legs than she will have to take pain medication the entire time that she is away from home. (AR 59.)

Plaintiff last travelled out of state in 2002. (AR 61.) When she stopped working her oldest son was in high school and played water polo. (AR 62.) She went to a couple of tournaments that were two to two and a half hours away. (AR 62.) Plaintiff's youngest son plays golf and she did attend a couple of his tournaments the past year. (AR 62.) The tournament lasts about an hour and a half and she rode in a golf cart. (AR 62-63.) She went to a fund raiser dinner at the fair a few months ago with a friend. (AR 62.) When she goes to any event she will sit for a while, stand, walk around a bit, and then sit back down. (AR 62.)

A vocational expert, Thomas Dachelet, also testified at the hearing. (AR 65-71.)

**B.    ALJ Findings**

The ALJ made the following findings of fact and conclusions of law:

- Plaintiff met the insured status requirements of the Social Security Act through June 30, 2016.

- Plaintiff has not engaged in substantial gainful activity since January 10, 2011, the alleged onset date.

- Plaintiff has the following severe impairments: lumbar degenerative disc disease, status-post minimally invasive left-sided transforaminal interbody fusion at L5-S1 with segmental pedicle screw fixation and possible pseudo-arthrosis across interspace; and obesity.

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.

- Plaintiff has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), including lifting up to 20 pounds occasionally and 10 pounds frequently; standing and walking up to 6 hours in an 8-hour workday; and sitting up to 6 hours in an 8-hour workday, with the following restrictions: she can occasionally climb stairs and ramps, but can never climb ladders, ropes, or scaffolds. She can occasionally stoop, kneel, crouch, crawl, and balance. She must avoid concentrated exposure to extreme cold and wetness; and avoid hazards such as unprotected heights, fast moving machinery, and traversing uneven or slippery terrain.

- Plaintiff is capable of performing her past relevant work as an administrative clerk. This work does not require the performance of work-related activities precluded by Plaintiff's residual functional capacity.

- Plaintiff had not been under a disability, as defined in the Social Security Act, from January 10, 2011, through the date of the decision.

**C.    Medical Record**

On February 8, 2010, Plaintiff saw Dr. Pagulayan-Sy complaining of worsening back pain for a few days. (AR 294.) Plaintiff had tenderness in the L5 area on palpation with no edema. (AR 294.)

Plaintiff was seen on May 27, 2010, complaining of muscle spasms and localized pain. (AR 293.) Examination findings were normal. (AR 293.)

On August 10, 2010, Plaintiff was seen for persistent low back pain that was worsening. (AR 292.) The pain increased on prolonged sitting. (AR 292.) Plaintiff's examination findings were normal. (AR 292.) Plaintiff was seen on August 18, 2010, reporting improvement in her back pain after resting. (AR 291.) She was still having pain on and off with certain activities and prolonged sitting or standing. (AR 291.) The record notes tenderness in the L5 area on palpation with no edema. (AR 291.)

Plaintiff was seen on November 8, 2010, complaining of cold symptoms. (AR 290.) Other than sinus congestion and pressure, Plaintiff's examination findings were normal. (AR 290.)

On January 12, 2011, Plaintiff saw Dr. Pagulayan-Sy reporting worsening back pain with increased localized discomfort which increased with prolonged standing or sitting. (AR 289.) The record notes tenderness in the L5 area on palpation with no edema. (AR 289.) Plaintiff had an MRI of her lumbar spine on January 31, 2011, which found:

> 1. L4-5: Posterior ligamentous hypertrophy is present. The pedicle screws are in satisfactory position. No significant extradural defects are seen. No areas of abnormal increased or decreased enhancement are identified post administration of intravenous contrast material.
> 2. L5-51: Pedicle screws are in place. No significant anterior extradural defects are seen. Good posterior alignment is demonstrated. No areas of abnormal increased or decreased enhancement are identified post administration of intravenous contrast material.

(AR 288.)

On February 4, 2011, Plaintiff complained of having on and off pain in her low back with prolonged sitting or standing. (AR 287.) Dr. Pagulayan-Sy noted tenderness with no edema. (AR 287.) Plaintiff was seen on February 18, 2011, complaining of worsening low back pain and pain on prolonged sitting or standing. (AR 286.) Dr. Pagulayan-Sy noted tenderness in the L5 area on palpation with no edema. (AR 286.)

On May 25, 2011, Plaintiff reported that her back pain was better. (AR 285.) She was decreasing her use of Vicodin, rest helped her back pain and she was doing well. (AR 285.) Dr.

Pagulayan-Sy noted slight tenderness on palpation with no edema. (AR 285.)

Plaintiff saw Dr. Pagulayan-Sy on July 27, 2011, reporting on and off low back pain which increased with prolonged sitting or doing housework. (AR 284.) Dr. Pagulayan-Sy noted tenderness on palpation. (AR 284.)

On September 8, 2011, Plaintiff saw Dr. Pagulayan-Sy complaining of constant pain on standing or sitting. (AR 283.) Dr. Pagulayan-Sy noted tenderness on palpation with no edema. (AR 283.)

Plaintiff was seen by Dr. Pagulayan-Sy on January 20, 2012 reporting low back pain. (AR 282.) Plaintiff's pain was localized and she was doing less to help the pain. (AR 282.) Plaintiff had tenderness in the L5 area. (AR 282.)

On April 18, 2012, Plaintiff was seen by Dr. Pagulayan-Sy due to foul swelling urine and slight burning. (AR 280.) She complained of having low back pain on and off. (AR 280.) Examination findings were normal. (AR 280.)

Plaintiff saw Dr. Pagulayan-Sy on June 14, 2012. (AR 279.) Plaintiff complained that she was still having low back pain and was doing some walking. (AR 279.) Plaintiff's examination findings were normal. (AR 279.)

On August 12, 2012, Plaintiff was seen for a comprehensive orthopedic evaluation by Dr. Van Kirk. (AR 270-273.) Plaintiff appeared for the examination with the chief complaint of localized low back pain. (AR 270.) Review of the medical record showed complaints of severe chronic back pain with degenerative disc disease and a January 31, 2011 x-ray showing "In the L4-L5 as well as L5-S1 there are pedicle screws noted in satisfactory position." (AR 270.) Plaintiff stated that she stopped working due to chronic low back pain and this is the reason she is currently unable to work. (AR 270.) The pain radiates into the hip area, but not down the legs. (AR 270.) Pain increases if she has to lift heavy objects, twist, turn, climb, run, jump, squat, go up or down ladders, go up or down stairs frequently, crouch or crawl. (AR 270-271.) Plaintiff reported that she was able to stand, walk, and sit for about 45 minutes. (AR 271.) Cold weather enhances her pain. (AR 271.)

Plaintiff reported that she is only able to do a minimal amount of cooking because her

back will not tolerate long standing in the kitchen and twisting, turning, and dealing with pots and pans. (AR 271.) Plaintiff reported she does very little household chores such as vacuuming, mopping, and dusting. (AR 271.) Plaintiff gets up in the morning, takes a shower, and has breakfast. (AR 271.) She does some laundry several times a day from time to time. (AR 271.) Plaintiff is able to drive a car and generally takes a walk outdoors each day. (AR 271.) Plaintiff watches at least 10 hours of television a day, mainly lying down with her feet elevated. (AR 271.)

Dr. Van Kirk noted that Plaintiff sat comfortably in the examination chair, was able to get up and out of the chair, walks around the examination room and get on and off the examination table without difficulty. (AR 271.) Plaintiff's circulation was adequate in the upper and lower extremities bilaterally and peripherally. (AR 272.) Romberg test was normal and tandem walking with one foot in front of the other was satisfactory. (AR 272.) Plaintiff was able to squat down and take a few steps without difficulty. (AR 272.)

Spinal flexion was 0-50 degrees and extension was 0-60 degrees. (AR 272.) Lateral flexion was 0-45 and rotation 0-80 degrees bilaterally without pain or difficulty. (AR 272.) Plaintiff had two scars in the lumbar region and this is where the main pain is located radiating into the waist area posteriorly. (AR 272.) Plaintiff is able to bend over to within four inches of touching the floor with her long fingers. (AR 272.) Range of motion demonstrated flexion 0-80 degrees, extension 0-15 degrees, side-to-side tilt 0-20 degrees and, rotation 0-45 degrees in each direction of the dorsolumbar spine. (AR 272.)

Plaintiff had full range of motion bilaterally in her hip joints without pain or difficulty. (AR 272.) Knee joint extension was zero degrees and flexion 150 degrees bilaterally without pain or difficulty. (AR 272.) Ankle joint dorsiflexion was 0-20 degrees and plantar flexion 0-40 degrees bilaterally without pain or difficulty. (AR 272.) Shoulder joint showed forward flexion of 0-150 degrees, extension 0-40 degrees, abduction 0-150 degrees, adduction 0-30 degrees, internal rotation 0-80 degrees and external rotation 0-90 degrees bilaterally without pain or difficulty. (AR 272.) Elbow joint flexion-extension was 0-150 degrees, supination 0-80 degrees and pronation 0-80 degrees bilaterally without pain or difficulty. (AR 272.) Wrist joint

extension was 0-60 degrees, flexion 0-60 degrees, radial deviation 0-20 degrees and ulnar deviation 0-30 degrees bilaterally without pain or difficulty.  (AR 272.)  Examination of the finger and thumb joints showed flexion/extension of the proximal phalanx 70 degrees and distal phalanx 90 degrees bilaterally without pain or difficulty.  (AR 273.)

Straight leg raise was 90/90 bilaterally in the sitting and supine positions.  (AR 273.)  Motor strength/muscle bulk and tone was normal, 5/5, in upper extremities and lower extremities bilaterally.  (AR 273.)  Light touch and pinprick were intact throughout the upper extremities and lower extremities.  (AR 273.)  Deep tendon reflexes were equal and brisk in the upper extremities and lower extremities bilaterally. (AR 273.)

Plaintiff was diagnosed with status-post decompression of the lumbar spine with stabilization with pedicle screws and plates.  (AR 273.)  Dr. Van Kirk opined that Plaintiff should be able to stand and/or walk cumulatively for six hours out of an eight hour day; sit cumulatively for six hours out of an eight-hour day; and lift and carry frequently 10 pounds and occasionally 20 pounds, limited because of chronic residual low back pain.  (AR 273.)  Plaintiff did not need any assistive devices and was limited to frequent postural activities.  (AR 273.)  Plaintiff had no manipulative limitations.  (AR 273.)  As Plaintiff's symptoms are enhanced by cold weather, Plaintiff should not be required to work in an extremely cold or damp environment.  (AR 273.)

On August 20, 2012, Plaintiff was seen by Dr. Pagulayan-Sy.  (AR 278, 301.)  Plaintiff complained of having on and off lower back pain.  (AR 278.)  Plaintiff's examination was normal.  (AR 278.)

Plaintiff saw Dr. Pagulayan-Sy in January 2013, for sinus symptoms.  (AR 298.)  Examination was normal other than congestion and sinus tenderness.  (AR 298.)

Plaintiff was seen in September 2013, complaining of low back pain that worsened when sitting for prolonged periods.  (AR 300.)  Dr. Pagulayan-Sy noted tenderness in the L5 area with no edema.  (AR 300.)  Plaintiff received a flu shot on September 30, 2013.  (AR 299.)

On May 21, 2014, Dr. Pagulayan-Sy completed a Physical Residual Functional Capacity Statement for Plaintiff.  (AR 303-306.)  Dr. Pagulayan-Sy stated that Plaintiff suffered from low

back pain and fatigue. (AR 303.) Plaintiff had a constant ache in her lower back that was precipitated by mild activity, walking, standing, or prolonged sitting. (AR 303.) Plaintiff had side effects from her medication of nausea, drowsiness on taking narcotic medications, and stomach upset. (AR 303.) Dr. Pagulayan-Sy opined that Plaintiff was unable to walk one city block without rest or severe pain, walk one block on rough or uneven ground, climb steps without use of a handrail at a reasonable pace, and had problems stooping, crouching and bending. (AR 303-304.) Plaintiff has no problems with balance when ambulating. (AR 304.)

Plaintiff must lie down or recline for 2 hours and 15 minutes before needing to sit, stand, or walk. (AR 304.) Plaintiff would need to lie down about 6 hours in an 8 hour workday. (AR 304.) Plaintiff can sit for one hour, stand for 15 minutes, and walk for 15 minutes. (AR 304.) Plaintiff can sit for a total of two hours and stand for a total of less than one hour in an eight hour workday. (AR 304-305.) Plaintiff would need to take 5 to 6 unscheduled breaks of 15 to 20 minutes in an 8 hour workday. (AR 305.) With prolonged sitting, Plaintiff's legs would need to be elevated 12 inches for 70 percent of the workday. (AR 305.)

Plaintiff can occasionally lift and carry 5 pounds and rarely lift 10 pounds. (AR 305.) Plaintiff has no reaching, fingering, or handling limitations. (AR 305.) Plaintiff cannot climb stairs, ladders, scaffolds, ropes, or ramps. (AR 306.) Plaintiff would be off task more than 30 percent of the workday and could never complete a workday. (AR 306.)

Plaintiff was seen by Dr. Palencia on September 25, 2014. (AR 307-308.) Plaintiff's gait was normal. (AR 307.) Plaintiff had normal curvature of the lumbar spine with tenderness over the S1 spinous process. (AR 307.) Plaintiff had mild muscle spasms bilaterally in a symmetrical distribution in the paraspinous muscles. (AR 307.) There was no step-off and no trigger point. (AR 307.) Plaintiff had pain in the lower back when coming up from bending over. (AR 307.) She had full extension and was asymptomatic to 25 degrees. (AR 307.) Muscle strength was 5/5 bilaterally. (AR 307.) Ankle dorsiflexion and plantar flexion was normal and Plaintiff was able to walk on her heels and toes. (AR 307.) Patellar reflexes were normal bilaterally. (AR 307.) Plaintiff had sciatic notch tenderness present on the left. (AR 307.) Plaintiff had moderate tenderness on the right SI joint, and FABER test was negative for groin or SI pain. (AR 307.)

Right and left lower extremity examination was normal.  (AR 307-308.)  Tandem gait was normal.  (AR 308.)  Plaintiff was prescribed Robaxin, counseled to increase her activity, and was to schedule a steroid injection.  (AR 308.)

**III.**

**LEGAL STANDARD**

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled.  20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004).  The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g).  In reviewing findings of fact in respect to the denial of benefits, this court "reviews the

1  Commissioner's final decision for substantial evidence, and the Commissioner's decision will be

2  disturbed only if it is not supported by substantial evidence or is based on legal error."  Hill v.

3  Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012).  "Substantial evidence" means more than a

4  scintilla, but less than a preponderance.  Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996)

5  (internal quotations and citations omitted).  "Substantial evidence is relevant evidence which,

6  considering the record as a whole, a reasonable person might accept as adequate to support a

7  conclusion."  Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of

8  Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

9      "[A] reviewing court must consider the entire record as a whole and may not affirm

10  simply by isolating a specific quantum of supporting evidence."  Hill, 698 F.3d at 1159 (quoting

11  Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006).  However, it is not

12  this Court's function to second guess the ALJ's conclusions and substitute the court's judgment

13  for the ALJ's.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is

14  susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be

15  upheld.").

16                                          **IV.**

17                         **DISCUSSION AND ANALYSIS**

18      Plaintiff contends that the ALJ erred by improperly rejecting the opinion of Dr.

19  Pagulayan-Sy, her treating physician, and failing to provide clear and convincing reasons to

20  reject Plaintiff's testimony.  Defendants argue that the ALJ gave multiple proper reasons to reject

21  Dr. Pagulayan-Sy's opinion and for the credibility finding.

22      **A.    The ALJ Did Not Err in Evaluating Dr. Pagulayan-Sy's Opinion**

23      The weight to be given to medical opinions depends upon whether the opinion is

24  proffered by a treating, examining, or non-examining professional.  See Lester v. Chater, 81 F.3d

25  821, 830-831 (9th Cir. 1995).  In general a treating physician's opinion is entitled to greater

26  weight than that of a nontreating physician because "he is employed to cure and has a greater

27  opportunity to know and observe the patient as an individual."  Andrews v. Shalala, 53 F.3d

28  1035, 1040-41 (9th Cir. 1995) (citations omitted).  If a treating physician's opinion is

contradicted by another doctor, it may be rejected only for "specific and legitimate reasons" supported by substantial evidence in the record. <u>Ryan v. Commissioner of Social Sec.</u>, 528 F.3d 1194, 1198 (9th Cir.) (quoting <u>Bayless v. Barnhart</u>, 427 F.3d 1121, 1216 (9th Cir. 2005)).

Where the treating physician's opinion is contradicted by the opinion of an examining physician who based the opinion upon independent clinical findings that differ from those of the treating physician, the nontreating source itself may be substantial evidence, and the ALJ is to resolve the conflict. <u>Andrews</u>, 53 F.3d at 1041. However, if the nontreating physician's opinion is based upon clinical findings considered by the treating physician, the ALJ must give specific and legitimate reasons for rejecting the treating physician's opinion that are based on substantial evidence in the record. <u>Id.</u>

The ALJ gave little weight to the May 21, 2014 opinion of Dr. Pagulayan-Sy because it consisted mostly of box checking, and the boxes checked indicated that Plaintiff had very restrictive work-related limitations that are not supported by Dr. Pagulayan-Sy's treatment record. (AR 28.) Dr. Pagulayan-Sy's progress notes offered little if any clinical signs (i.e., range of motion studies, crepitus, swelling, tenderness, muscle spasm, straight leg raising, etc.) that would support the extreme exertional limitations assessed. (AR 28-29.) The ALJ found that the basis for Dr. Pagulayan-Sy's opinion was therefore unclear. (AR 29.) The ALJ gave little weight to Dr. Pagulayan-Sy's opinion because

> The opinion of Dr. Pagulayan-Sy was overly restrictive and not supported by progress notes that showed the claimant had intermittent low back pain (Exhibits 3F, p. 5; 2F, p. 4); and had generally normal physical examination findings; and her condition had not worsened or changed since she last worked (Exhibits 2F, p. 2). Except for findings of occasional lumbar tenderness (Exhibit 3F, p. 4), there were minimal physical examination findings (Exhibit 3F, p. 2). On imaging, an MRI of the claimant's lumbar spine showed only ligamentous hypertrophy and was otherwise normal following surgery (Exhibit 2F, p. 12). The opinion of Dr. Pagulayan-Sy that the claimant needed to recline for two hours and 15 minutes at one time and for a total of six hours in an eight-hour day; sit for a total of two hours in an eight-hour day; and stand or walk for less than one hour in an eight-hour day was not supported by the treatment record or objective findings, and was contrary to Dr. Pagulayan-Sy's advice to the claimant to increase exercise (Exhibits 3F, p. 5; 2F, p. 2). There was no change in the claimant's condition following surgery in July 2006 and she continued working through January 2011. After the alleged onset of disability in January 2011, she was seen a few times a year for medication management, and there were minimal or no objective findings at those examinations. The medical record did not reveal medication side-effects or other evidence of work related functional limits.

14

1  (AR 29.)

2       Plaintiff argues that the ALJ failed to articulate a legally sufficient rational for rejecting

3  Dr. Pagulayan-Sy's opinion because of the general treatment notes arguing that the function of

4  the medical record is to promote communication and record keeping for the health care personnel

5  and not to provide evidence of disability determinations.  However, it is clearly established that

6  the ALJ need not accept the opinion of any physician that is brief, conclusory, and unsupported

7  by clinical findings.  <u>Thomas</u>, 278 F.3d at 957.

8       The ALJ considered that Dr. Pagulayan-Sy opined that Plaintiff's medication side effects

9  would interfere with Plaintiff's attention and concentration and she had nausea, drowsiness, and

10  upset stomach when she took narcotic medication, however this is inconsistent with the medical

11  record and Plaintiff's testimony.  (AR 29.)  The side effects described were not mentioned in Dr.

12  Pagulayan-Sy's progress notes or other treatment records.  (AR 29.)  Review of Dr. Pagulayan-

13  Sy's treatment notes show that they are devoid of any mention that Plaintiff had side effects from

14  her medication.  Plaintiff testified she did not take narcotic medication daily, but only took the

15  medication when needed.  (AR 29.)  Plaintiff testified that she only takes her pain medication

16  maybe three times per week.  (AR 58.)  The hydrocodone makes her feel lethargic and on

17  occasion her medication makes her sleepy.  (AR 54, 58.)  She has to take her medication on a full

18  stomach and even then it sometimes makes her nauseous.  (AR 58.)  The ALJ found there was no

19  evidence Plaintiff had side effects that caused more than minimal limitation upon basic work

20  activities.  (AR 29.)  Substantial evidence supports the ALJ's finding that the side effects of

21  Plaintiff's medication cause no more than minimal limitations on basic work activities.

22       While the records note that Plaintiff had some tenderness in the lumbar area, the ALJ

23  considered that Dr. Pagulayan-Sy offered very general statements about Plaintiff's back pain.

24  (AR 29.)  The ALJ found that Dr. Pagulayan-Sy's opinion was not entitled to controlling weight

25  because her treatment notes were cursory and general.  (AR 29.)  From June through August

26  2012, Plaintiff reported on and off back pain and was advised to exercise and she was doing

27  some walking.  (AR 29.)  The record notes tenderness on palpation with no edema on February

28  8, 2010; August 18, 2010; February 4, 2011; February 18, 2011; May 25, 2011; July 27, 2011;

September 8, 2011; January 20, 2012; and September 2013. (AR 282, 283, 284, 285, 286, 287, 291, 293, 300.) However, examination findings were normal on August 10, 2010; November 8, 2010; April 18, 2012; June 14, 2012; August 20, 2012; and January 2013. (AR 278, 279, 280, 289, 292, 298.) The ALJ could properly conclude that these cursory findings of tenderness did not support the extreme limitations opined by Dr. Pagulayan-Sy.

The ALJ also considered that at times the record indicates that Dr. Pagulayan-Sy only saw Plaintiff several times a year, and that Plaintiff's condition was improving. (AR 29.) While Plaintiff's visits were more frequent in 2010 (5 visits) and 2012 (6 visits), Plaintiff only saw Dr. Pagulayan-Sy four times in 2012 and twice in 2013. On May 25, 2011, Plaintiff reported that her back pain was better and she was decreasing the use of Vicodin. (AR 285.) Plaintiff reported that she had low back pain on and off that was brought on by prolonged sitting or standing. (AR 278, 279, 280, 284, 287, 291.)

Additionally, the ALJ gave substantial weight to the opinion of Dr. Van Kirk because it was consistent with the medical record, examination findings and overall evidence of record. (AR 28.) While Dr. Van Kirk also found that Plaintiff had pain in the lumbar region that radiated into the waist area posteriorly (AR 272), he conducted a physical examination and set forth his findings. (AR 271-273.) Dr. Van Kirk noted that Plaintiff was able to sit comfortably in the examination chair, get up and out of the chair, walk around the examination room, and get up and off the examination table without difficulty. (AR 271.) Plaintiff was able to squat and take a few steps without difficulty. (AR 272.) Plaintiff was able to bend over and get within four inches of the touching the ground with her long fingers. (AR 272.) Plaintiff circulation was adequate, Romberg testing was normal and tandem foot walking was satisfactory. (AR 272.) Dr. Van Kirk tested Plaintiff's range of motion in her spine. (AR 272.) Plaintiff's straight leg raise was 90/90 bilaterally in the sitting and supine position. (AR 273.) Plaintiff had normal muscle bulk and tone; and her muscle strength was 5/5 in the upper and lower extremities bilaterally. (AR 273.)

After examination and testing, Dr. Van Kirk opined that Plaintiff should be able to stand and/or walk cumulatively for six hours out of an eight hour day; sit cumulatively for six hours

out of an eight-hour day; and lift and carry frequently 10 pounds and occasionally 20 pounds, limited because of chronic residual low back pain. (AR 273.) Plaintiff did not need any assistive devices and was limited to frequent postural activities. (AR 273.) Plaintiff had no manipulative limitations. (AR 273.) As Plaintiff's symptoms are enhanced by cold weather, Plaintiff should not be required to work in an extremely cold or damp environment. (AR 273.) Since the contradictory opinion of Dr. Van Kirk is based upon independent clinical findings that differ from those of Dr. Pagulayan-Sy, the nontreating source itself may be substantial evidence, and the ALJ is to resolve the conflict. Andrews, 53 F.3d at 1041.

The ALJ also gave substantial weight to the opinion of Dr. Combs, the state agency physician because it was consistent with the medical record, the opinion of Dr. Van Kirk, and the overall evidence in the record. (AR 30.) On February 20, 2013, Dr. Combs completed a residual functional capacity assessment for Plaintiff. (AR 101-103.) Dr. Combs opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently. (AR 101.) Stand, walk and or sit for about 6 hours in a total 8 hour work day. (AR 101.) Plaintiff had unlimited ability to push or pull other the lift and/or carry limitations. (AR 101.) Plaintiff's limitations were due to residual pain and discomfort from spinal decompression surgery. (AR 101.) Plaintiff could occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance, kneel, crouch, and crawl. (AR 101-102.) Plaintiff should avoid concentrated exposure to extreme cold, wetness, humidity, vibration, and hazards. (AR 102.) But Plaintiff had no other limitations. (AR 102.) Dr. Combs opined that, "[b]ased on review of the longitudinal data available for review at this time, [Plaintiff] is restricted to light" work. (AR 103.) The contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, however, "it may constitute substantial evidence when it is consistent with other independent evidence in the record." Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). Here, Dr. Combs' opinion is consistent with the opinion of Dr. Van Kirk and provides substantial evidence to support the ALJ's decision.

The ALJ proffered specific and legitimate reasons to reject the opinion of Dr. Pagulayan-Sy that are supported by substantial evidence in the record.

## B.     Plaintiff's Credibility

Plaintiff argues that the opinion of the ALJ must be reversed because the ALJ failed to articulate sufficient reasons to find Plaintiff not credible.  Defendant responds that Plaintiff's out of circuit legal citations are contrary to the law in the Ninth Circuit and the ALJ provided numerous legally sufficient reasons to reject Plaintiff's testimony.

"An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment." Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (internal punctuation and citations omitted).  Determining whether a claimant's testimony regarding subjective pain or symptoms is credible, requires the ALJ to engage in a two-step analysis.  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012).  The ALJ must first determine if "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal punctuation and citations omitted).  This does not require the claimant to show that her impairment could be expected to cause the severity of the symptoms that are alleged, but only that it reasonably could have caused some degree of symptoms.  Smolen, 80 F.3d at 1282.

Second, if the first test is met and there is no evidence of malingering, the ALJ can only reject the claimant's testimony regarding the severity of her symptoms by offering "clear and convincing reasons" for the adverse credibility finding.  Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1160 (9th Cir. 2008).  The ALJ must specifically make findings that support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony.  Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal punctuation and citations omitted).  Factors that may be considered in assessing a claimant's subjective pain and symptom testimony include the claimant's daily activities; the location, duration, intensity and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; functional restrictions; and other relevant factors.

Lingenfelter, at 1040; Thomas, 278 F.3d at 958.  In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment. . . ."  Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284).

Plaintiff argues that the ALJ merely provided boilerplate language which is insufficient. The ALJ state that "[a]fter careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, her statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible for the reasons explained in this decision."  (AR 27.) However, this was not the extent of the ALJ's credibility discussion.

The ALJ considered the third party function report completed by Christine Henry on July 7, 2012, which indicated that Plaintiff engaged in a wide range of daily activities not fully consistent with Plaintiff's allegations of disability.  (AR 27, 196-203.)  Ms. Henry stated she has known Plaintiff for ten years and spends three to eight hours per week with Plaintiff.  (AR 196.) In a regular day, Plaintiff takes care of her personal hygiene, makes herself breakfast and lunch, does daily chores as permitted by her pain, shops as needed, assists with meal preparation at dinner, and attends sporting events.  (AR 196.)  Plaintiff cares for her husband and children, does housekeeping, prepares meals, does laundry, and helps with school work.  (AR 197.)  Plaintiff feeds her two small dogs and lets them outside.  (AR 197.)  Plaintiff's daily activities are greatly reduced as well as any physical activity.  (AR 197.)  Plaintiff spends one to two hours per day preparing meals making breakfast a couple times a week and dinners almost daily with help. (AR 198.)  Plaintiff is able to do average chores daily, but cannot complete too many tasks in a day.  (AR 198.)  Plaintiff does housecleaning and laundry over a series of days rather than doing all in a single day.  (AR 198.)  She spends about 20 to 30 hours per week in these tasks.  (AR 198.)  Plaintiff needs help with everything.  (AR 198.)  Plaintiff goes outside daily, but is unable to do yardwork because it would cause too much pain.  (AR 199.)

Ms. Henry also reported that Plaintiff is able to drive and shops 1 to 2 times a week for 2 to 3 hours each time. (AR 199.) Plaintiff enjoys watching television, reading books, jewelry making, and entertaining. (AR 200.) Plaintiff does these activities daily except that she hardly ever entertains. (AR 200.) Plaintiff lies down frequently because sitting causes her pain. (AR 200.) Plaintiff uses her computer and phone, goes to sporting events and eats out. (AR 200.) These activities are done a couple times per week. (AR 200.) Plaintiff used to be a very active person and enjoyed hosting large parties. (AR 203.) She is not able to do that anymore. (AR 203.) After the last function held at Plaintiff's house she was on bed rest and in a lot of pain. (AR 203.) The ALJ properly found that Ms. Henry's statement was inconsistent with Plaintiff's report that she might do a load of laundry in a day but really does nothing and spends all day every day elevating her feet. (AR 49, 58.)

Plaintiff argues that this does not contradict Plaintiff's testimony that she is unable to perform work ability on a sustained basis. The ALJ specifically found that Plaintiff engaged in a wide range of daily activities not fully consistent with Plaintiff's allegations of disability. The ALJ did not err in finding that the third party witness testimony indicated that Plaintiff's testimony was not credible as to the extent of her limitations.[2]

The ALJ also considered that Plaintiff reported to Dr. Van Kirk that she could stand, walk, and sit each for 45 minutes. (AR 28, 271.) However, physical examination was generally normal with few abnormal physical findings; and Dr. Van Kirk noted that Plaintiff was able to get up from a chair without difficulty; get on and off the examination table without difficulty; gait was normal without an assistive device; and her Romberg and tandem walking with one foot in front of the other were normal. (AR 28, 271-273.) Plaintiff was able to get up on her toes and

---

[2] Plaintiff argues that that it would be inconsistent for the ALJ to accept some of Plaintiff's testimony but not that part of the testimony that would support her impairments. Plaintiff cites to Carradine v. Barnhart, 360 F.3d 751, 754–56 (7th Cir.2004), which suggests that the ALJ should be required to accept all or none of the claimant's testimony. However, "the decisions in other circuits are not binding upon this court." The Dauntless, 129 F. 715, 717 (9th Cir.1904). Plaintiff points to no Ninth Circuit authority to support the argument that the ALJ must believe all or none of the claimant's testimony. Further, this is clearly contrary to Ninth Circuit case law addressing an ALJ's analysis of the claimant's credibility. See also Ninth Circuit Civil Jury Instruction 1.14 ("if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.") It is for the ALJ to make the determination of which testimony to believe and which testimony to not believe.

heels; squat; and take a few steps without difficulty; and could bend over and touch her fingers to within four inches of the floor. (AR 28, 272.) Plaintiff's range of motion was generally normal and she had normal strength in all extremities. (AR 28, 272-273.)

The determination that a claimant's complaints are inconsistent with clinical evaluations can satisfy the requirement of stating a clear and convincing reason for discrediting the claimant's testimony. <u>Regennitter v. Commissioner of Social Sec. Admin.</u>, 166 F.3d 1294, 1297 9th Cir. 1999). The ALJ properly considered this evidence in weighing Plaintiff's credibility. "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." <u>Rollins v. Massanari</u>, 261 F.3d 853, 857 (9th Cir. 2001) (citing 20 C.F.R. § 404.1529(c)(2)).

The ALJ provided clear and convincing reasons to find that Plaintiff's complaints regarding the severity of her impairments were not entirely credible.

**V.**

**CONCLUSION AND ORDER**

Based on the foregoing, the Court finds that the ALJ did not err in addressing the opinion of Plaintiff's treating physician or Plaintiff's credibility. Accordingly,

IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is DENIED. It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Lorna Lynn Duke. The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated: __**April 19, 2017**__

_____
UNITED STATES MAGISTRATE JUDGE